1

2

3

4

5

6

7  TERRY R. MILLER (CO Bar No. 39007)
   Email: MillerTe@sec.gov
8  LESLIE J. HUGHES (CO Bar No. 15043)
9  Email: HughesLj@sec.gov

10
   Attorneys for Plaintiff
11 Securities and Exchange Commission
   Denver Regional Office
12 1961 Stout Street, Suite 1700
13 Denver, Colorado 80294
   Telephone: (303) 844-1000
14

15

16              UNITED STATES DISTRICT COURT

17           WESTERN DISTRICT OF WASHINGTON

18

19 UNITED STATES SECURITIES AND       Case No.:  [Case No.]
20 EXCHANGE COMMISSION,
                                       **COMPLAINT AND**
21                        Plaintiff,   **JURY DEMAND**

22 v.

23 RONALD A. FOSSUM, JR. and
   ALONZO R. CAHOON,
24
                        Defendants.
25

26

27
                              **1**
28 COMPLAINT
                                       U.S. Securities and Exchange Commission
                                       1961 Stout Street, Suite 1700
                                       Denver, CO 80294   Phone: 303-844-1000

Plaintiff United States Securities and Exchange Commission (the "Commission") alleges:

## I.   SUMMARY

1.   This matter concerns a scheme by Defendant Ronald A. Fossum, Jr. ("**Fossum**") to defraud three pooled investment funds, as well as investors in those funds, and Defendant Alonzo R. Cahoon's ("**Cahoon**") fraudulent and deceptive conduct with respect to one of those funds.

2.   From approximately March 2011 through at least June 2016, Fossum raised over $20 million from over one hundred investors in three pooled investment funds that he managed: (a) Smart Money Secured Income Fund, LLC ("**Smart Money Fund**"), which invested principally in real estate, websites, oil and gas ventures, and securities; (b) Turnkey Investment Fund, LLC ("**Turnkey Fund**"), which invested in oil and gas ventures; and (c) Accelerated Asset Group, LLC ("**Accelerated Asset**"), which invested in distressed consumer debt (Smart Money, Turnkey Fund, and Accelerated Asset are, collectively, the "**SMFG Funds**").

3.   Fossum managed the respective SMFG Funds through three entities he owned and controlled—SMFG, Inc. ("**SMFG**"), Smart Money Secured Income Fund Manager, LLC ("**Smart Money Manager**"), and Turnkey Investment Fund Manager, LLC ("**Turnkey Manager**") (SMFG, Smart Money Manager, and Turnkey Manager are, collectively, the "**Managing Entities**").

4.   In connection with raising investor money and managing the SMFG Funds, Fossum engaged in multiple fraudulent and deceptive acts, including misappropriating money for various personal expenses, misrepresenting the financial condition of the funds, concealing one fund's inability to redeem investments as promised in offering documents to investors, and indiscriminately

COMPLAINT

U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO 80294   Phone: 303-844-1000

commingling fund assets and transferring money between funds. Fossum and Cahoon also made material misstatements and misleading omissions in offering documents regarding compensation they received from one of the funds.

5.     Despite routinely telling SMFG Funds investors that, unlike other money managers, he charged his investors "no fees" or modest fees, Fossum defrauded the SMFG Funds and their investors by improperly using money from the funds for his personal expenses, including: (a) living rent-free in a Smart Money Fund-owned home for three years during which Smart Money Fund made about $140,000 in mortgage payments on the home; (b) the payment of roughly $150,000 in personal tax liabilities; and (c) the payment of about $40,000 to travel to seminars at luxury resorts in Fiji, Africa, Mexico, and Hawaii.

6.     Fossum also repeatedly misrepresented the financial condition of Smart Money Fund to investors, claiming at one point that Smart Money Fund had over $40 million in assets and only $10 million in liabilities when, in fact, Smart Money Fund's assets were, by Fossum's own estimates, closer to $14 million.

7.     Additionally, in June 2015, when a number of Smart Money Fund investors sought redemptions, Smart Money Fund lacked the liquidity to satisfy those redemptions in accordance with the terms of investor contracts. Nonetheless, Fossum continued to raise new investor money for Smart Money Fund after June 2015, while failing to disclose the liquidity crisis, and then used new investor monies in part to pay off redeeming investors in a Ponzi-like fashion.

8.     Fossum also defrauded the SMFG Funds by frequently disregarding each fund's separate corporate form and commingling fund assets by transferring hundreds of thousands of dollars between the SMFG Funds to meet their respective liquidity needs.

COMPLAINT

U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO 80294     Phone: 303-844-1000

9.      Fossum and Cahoon defrauded Turnkey Fund and Turnkey Fund's investors by representing in fund offering documents that they would charge a one-time "management fee" of $2,990 per Turnkey Fund investment unit when, in fact, Fossum and Cahoon secretly took $20,000 or more from each investment unit sold.

10.      Last, Fossum offered and sold interests in Smart Money Fund and Turnkey Fund securities, and Cahoon offered and sold Turnkey Fund securities, without a registration statement for the offerings or any applicable exemption from registration. Further, Fossum and Cahoon acted as unregistered brokers by effecting transactions in Turnkey Fund securities and receiving transaction-based compensation for those transactions.

11.      In June 2016, Fossum caused the SMFG Funds and the Managing Entities to file for bankruptcy. The consolidated bankruptcy estate, which includes the SMFG Funds, is presently being liquidated, and it is not probable that it has sufficient assets for any meaningful repayment of the more than $20 million in principal contributed by investors.

## II.      JURISDICTION AND VENUE

12.      This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act of 1933 (the "**Securities Act**") [15 U.S.C. §§ 77t(b), 77t(d), 77v(a)], Sections 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 (the "**Exchange Act**") [15 U.S.C. §§ 78u(d), 78u(e), and 78aa], and Sections 209(d), (e) and 214 of the Investment Advisers Act of 1940 (the "**Advisers Act**") [15 U.S.C. §§ 80b-9(d), (e) and 80b-14].

13.      Defendants, directly or indirectly, have made use of the means or instruments of transportation or communication in, and the means or instrumentalities of, interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein.  Many of these

**4**

COMPLAINT

transactions, acts, practices, and courses of business occurred in the Western District of Washington.

14. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14].

15. Defendant Fossum's last known residence is in this District and at all time relevant to this Complaint Fossum resided in this District, Fossum managed the funds while in this District, a substantial part of the events and omissions giving rise to the claims occurred in this District, many victims of Defendants' wrongdoing underlying the claims in this case reside in this District, and a substantial part of property that is the subject of the action is situated in this District.

16. Cahoon directed investors to wire at least $1 million in funds to Fossum's office in this District; Cahoon regularly communicated with Fossum in in this District regarding the formation, offering, and sale of Turnkey Fund investments; he visited this District at least one time to meet with Fossum and others about their business; and Cahoon communicated with investors in this District.

17. Fossum and the Commission entered into a tolling agreement that collectively tolled the running of any applicable statute of limitations for the period from July 14, 2017 through January 14, 2018. Securities law violations from July 14, 2012 to January 14, 2013 are encompassed by the tolling agreements and are within the five-year limitation period for certain relief set forth in 28 U.S.C. § 2462.

COMPLAINT

U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO 80294    Phone: 303-844-1000

## III. DEFENDANTS AND RELATED ENTITIES

### A. DEFENDANTS

18.    **Ronald A. Fossum, Jr.**, age 50, owned a majority interest in and controlled SMFG, through which he also controlled the Managing Entities and the SMFG Funds. His last known residence is located in or around Snohomish, Washington. Fossum is an independent insurance agent who branched out into fund management. Fossum was never registered as or associated with a broker-dealer or registered with any state securities regulator.

19.    **Alonzo Cahoon**, age 51, was the manager of Turnkey Manager (Turnkey Fund's managing member) from Turnkey Fund's inception in mid-2014 until Cahoon's resignation in March 2015. He is a resident of Morgan, Utah. Cahoon was never registered as or associated with a broker-dealer.

### B. THE MANAGING ENTITIES

20.    **SMFG, Inc.** ("**SMFG**") was a Nevada corporation with its principal place of business in Lake Stevens, Washington. SMFG was the managing member of two limited liability companies that managed pooled investment funds: Turnkey Manager and Smart Money Manager. Fossum owned a majority interest in and controlled SMFG. SMFG was never registered with the Commission in any capacity. The consolidated bankruptcy estate, which includes SMFG, Inc., is presently being liquidated.

21.    **Smart Money Secured Income Fund Manager, LLC** ("**Smart Money Manager**") was a Nevada entity with its principal place of business in Lake Stevens, Washington. Smart Money Manager was the managing member of and an investment adviser to Smart Money Fund and Accelerated Asset. Fossum controlled Smart Money Manager through his control of SMFG. Smart Money Manager was never registered with the Commission in any capacity. The

COMPLAINT

U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO 80294    Phone: 303-844-1000

1  consolidated bankruptcy estate, which includes Smart Money Manager, is

2  presently being liquidated.

3      22.    **Turnkey Investment Fund Manager, LLC** ("**Turnkey Manager**")

4  was a Nevada entity with its principal place of business in Lake Stevens,

5  Washington. Turnkey Manager was the managing member of and an investment

6  adviser to Turnkey Fund. Fossum controlled Turnkey Manager through his control

7  of SMFG. Turnkey Manager was never registered with the Commission in any

8  capacity. The consolidated bankruptcy estate, which includes Turnkey Manager, is

9  presently being liquidated.

10  **C.**    **THE SMFG FUNDS**

11      23.    **Accelerated Asset Group, LLC** ("**Accelerated Asset**") was a

12  Washington entity with its principal place of business in Lake Stevens,

13  Washington. Accelerated Asset was a pooled investment fund that primarily

14  invested in distressed consumer debt. Smart Money Manager was Accelerated

15  Asset's managing member. Fossum conceived of, controlled, managed, and made

16  investment decisions for Accelerated Asset. Accelerated Asset was never

17  registered with the Commission in any capacity. The consolidated bankruptcy

18  estate, which includes Accelerated Asset, is presently being liquidated.

19      24.    **Smart Money Secured Income Fund, LLC** ("**Smart Money Fund**")

20  was a Nevada entity with its principal place of business in Lake Stevens,

21  Washington. Smart Money Fund was a pooled investment fund that invested

22  primarily in real estate, internet websites, and oil and gas ventures. Fossum

23  conceived of, controlled, managed, and made investment decisions for Smart

24  Money Fund. Smart Money Fund was never registered with the Commission in any

25  capacity. The consolidated bankruptcy estate, which includes Smart Money Fund,

26  is presently being liquidated.

27

28  COMPLAINT

U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO 80294     Phone: 303-844-1000

25.     **Turnkey Investment Fund, LLC** ("**Turnkey Fund**") was a Nevada entity with its principal place of business in Lake Stevens, Washington. Turnkey Fund was a pooled investment fund that invested exclusively in oil and gas projects. Fossum conceived of, controlled, and had final approval over all investment decisions for Turnkey Fund. From mid-2014 through March 2015 Fossum delegated authority to Cahoon to perform various management functions on behalf of Turnkey Fund, including, signing contracts, hiring tax and accounting professionals, managing Turnkey Fund's bank accounts, marketing Turnkey Fund to investors, and identified, assessed, and recommended investments for Turnkey Fund. Turnkey Fund was never registered with the Commission in any capacity. The consolidated bankruptcy estate, which includes Turnkey Fund, is presently being liquidated.

## IV.    FACTS

**A.    FOSSUM AND CAHOON OFFERED AND SOLD SMFG FUND SECURITIES.**

**i.    Accelerated Asset Promissory Notes Were Securities.**

26.     Fossum controlled SMFG, which managed Smart Money Manager. In turn, Smart Money Manager managed Accelerated Asset.

27.     Between approximately June 2011 and March 2013, Fossum raised just less than $1 million from roughly forty investors by selling them Accelerated Asset promissory notes ("**Accelerated Asset Notes**"). These notes were securities under federal law. Most investors in Accelerated Asset Notes were Fossum's insurance clients whom he solicited personally to invest in Accelerated Asset.

28.     In written offering materials over which Fossum had ultimate authority, Fossum repeatedly characterized Accelerated Asset Notes as "securities." Accelerated Asset Notes promised a twelve percent compounded annual return over a four-year term, with principal and interest due upon maturity.

**8**

COMPLAINT

29.     In written offering materials and orally, Fossum told Accelerated Asset investors that they would pool investor money together and use it to purchase distressed debt.

30.     Fossum led Accelerated Asset Note investors—many of whom were unsophisticated individuals—to expect profits solely on the basis of the efforts of Fossum and his agents.  For example, Accelerated Asset offering materials made clear to investors that Accelerated Asset management, not investors, "shall have full and complete power and discretion to manage and control the business, affairs and properties of the [Accelerated Asset]."

31.     Fossum made all investment decisions for Accelerated Asset. Fossum caused Accelerated Asset to invest in pools of uncollected consumer credit card debt and shares of preferred stock of a debt collection company.

32.     Fossum regularly communicated with prospective and actual Accelerated Asset Note investors by phone and email, among other means, and transferred Accelerated Asset monies using interstate banking systems. Accelerated Asset Note investors resided in a variety of states, including, but not limited to, California and Washington.

**ii.     Smart Money Fund Promissory Notes Were Securities.**

33.     Fossum controlled SMFG, which managed Smart Money Manager. In turn, Smart Money Manager managed Smart Money Fund.

34.     From approximately May 2012 through at least April 2016, Fossum raised over $7 million from roughly one hundred investors by selling them Smart Money Fund promissory notes ("**Smart Money Fund Notes**"). These notes were securities under federal law.

35.     Many investors in Smart Money Fund Notes were Fossum's insurance clients whom he solicited personally to invest in Smart Money Fund.

COMPLAINT

U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO 80294     Phone: 303-844-1000

36.     In written offering materials over which Fossum had ultimate authority, Fossum described Smart Money Fund Notes as "securities," and promised investors a twelve percent annual return over a three-year term. Payment of all principal and interest was due only upon maturity, though investors could chose to allow the notes to roll over for additional one-year periods after the first three years, in which case investors could redeem their interest "on any subsequent anniversary of the Maturity Date."

37.     In written offering materials and orally, Fossum told Smart Money Fund Note investors that they would pool investor money together: "funds collected for the purchase of [Smart Money Fund] Notes will be deposited in [Smart Money Fund's] operating account and become immediately available for use by [Smart Money Fund]."

38.     Smart Money Fund would then use the pooled money to purchase, among other things, "real estate," "oil and gas interests," "domain names and websites," and "stocks, bonds, futures contracts, options, and other derivative instruments."

39.     Fossum made clear that investors would have no involvement in Smart Money Fund's investment decisions or daily operations: "[Smart Money Fund's] investors will have no voice in the management of its operations." Fossum thus led Smart Money Fund Note investors to expect profits solely on the basis of the efforts of Fossum and his agents.

40.     Fossum made all investment decisions for Smart Money Fund. Fossum caused Smart Money Fund to invest in the securities of, among other things, a debt collection company and a residential care facility. Fossum also caused Smart Money Fund to invest in real estate, websites, and oil and gas ventures.

COMPLAINT

U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO 80294     Phone: 303-844-1000

41.     Fossum regularly communicated with prospective and actual Smart Money Fund Note investors by phone and email, among other means, and transferred Smart Money Fund monies using interstate banking systems. Smart Money Fund Note investors resided in a variety of states, including, but not limited to, Arizona, Florida, New Mexico, Oregon, Texas, and Washington.

### iii.     Smart Money Fund Investment Contracts Were Securities.

42.     From March 2013 through at least April 2015, Fossum raised roughly $6 million from approximately sixty investors, purportedly to purchase and operate revenue generating websites, through so-called "Joint Venture Agreements" between investors and Smart Money Fund ("**Smart Money Fund Investment Contracts**"). These contracts were securities under federal law.

43.     The Smart Money Fund Investment Contracts, which Fossum created, provided that: (a) investors paid Smart Money Fund a "Joint Venture Participation Amount," ranging from a few thousand to hundreds of thousands of dollars; and (b) Smart Money Fund would in turn, on a monthly basis, pay the investor a fixed monthly rate of return ranging from eight to twelve percent of the Joint Venture Participation Amount.

44.     Most Smart Money Fund Investment Contracts were for an indefinite term, and allowed investors to request repayment of their Joint Venture Participation Amount (their principal) on every annual "anniversary" of their initial investment. Upon such a redemption request, Smart Money Fund had 180 days to repay the investor's principal.

45.     The Smart Money Fund Investment Contracts purported to require Smart Money Fund to purchase and operate websites that generated advertising revenues, which were to be the source of investors' monthly returns.

COMPLAINT

U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO 80294     Phone: 303-844-1000

46.     In actuality, Fossum caused Smart Money Fund to contract with a *third party* to purchase and operate the revenue generating websites, and to remit monthly revenue payments, portions of which went to (a) monthly payments to Smart Money Fund Investment Contract investors, and (b) Smart Money Fund's general account.

47.     The fortunes of Smart Money Fund Investment Contract investors, Smart Money Fund and Fossum were thus linked together because they were dependent upon the success of the third party that operated the websites.

48.     Similarly, Fossum caused the Smart Money Fund Investment Contracts to purport to require investors to undertake a variety of affirmative "responsibilities," such as providing website marketing advice.

49.     In reality, however, Fossum and his agents orally assured prospective investors that their investments with Smart Money Fund would be entirely "passive" and that Fossum and his agents would wholly manage and operate the websites. Fossum also instructed an agent who marketed Smart Money Fund Investment Contracts "not to worry" about the putative "responsibilities," which Fossum described as "more of a legality."

50.     In fact, Smart Money Fund never required that investors do anything beyond paying the Joint Venture Participation Amount, and some Smart Money Fund Investment Contract investors did not even know the name or web address of the websites for which they had putative marketing "responsibilities."

51.     Smart Money Fund investors had no involvement whatsoever in any Smart Money Fund investment decisions or daily operations, which Fossum controlled. Fossum led Smart Money Fund Investment Contract investors to expect monthly returns from Smart Money Fund based solely on Fossum and his agents' purported operation of websites.

COMPLAINT                                    U.S. Securities and Exchange Commission
                                             1961 Stout Street, Suite 1700
                                             Denver, CO 80294     Phone: 303-844-1000

52.     Fossum pooled the proceeds from the sale of Smart Money Fund Investment Contracts in Smart Money Fund's general bank account and used them, in part, to fund Smart Money Fund's investments and operations.

53.     Fossum and his agents regularly communicated with prospective and actual Smart Money Fund Investment Contract investors by phone and email, among other means, and transferred Smart Money Fund monies using interstate banking systems. Smart Money Fund Investment Contract investors resided in a variety states, including, but not limited to, California, Colorado, Florida, Maryland, New York, Utah, and Washington.

### iv.     Turnkey Fund Investment Contracts Were Securities.

54.     Fossum controlled SMFG, which managed Turnkey Manager. Cahoon was SMFG's limited partner in Turnkey Manager. Turnkey Manager managed Turnkey Fund.

55.     Between approximately July 2013 and November 2014, Fossum and Cahoon raised approximately $6 million from approximately thirty investors in Turnkey Fund. In written offering materials and orally, Fossum and Cahoon told these investors that Turnkey Fund would pool their monies: "[Turnkey Fund Unit investors] will contribute capital to [Turnkey Fund] . . . in return for Joint Venture Participation Units in the Joint Venture."

56.     Fossum had ultimate control and authority over the contents of Turnkey Fund's written offering materials and the decision to disseminate the materials to prospective investors.

57.     Fossum and Cahoon told investors that Turnkey Fund would use their pooled monies "to acquire[] oil and gas working interests . . . ."

58.     Fossum and Cahoon sold investors Turnkey Fund "Joint Venture Participation Units" ("**Turnkey Fund Units**") through which investors were

COMPLAINT

U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO 80294     Phone: 303-844-1000

(a) equity owners of Turnkey Fund; (b) entitled to a pro rata share of the profits, if any, generated by the oil and gas projects in which Turnkey Fund invested; and (c) obligated to cover a pro rata share of any capital shortfalls the projects might encounter. These units were securities under federal law.

59.     In turn, Fossum and Cahoon caused Turnkey Fund to pool investor funds together and use them to purchase non-operating working units through joint venture agreements offered by oil and gas operators.

60.     Those operators used Turnkey Fund's investment and the investments of other joint venturers to fund their oil and gas exploration and drilling operations, promising a share of the resulting profits, if any. Thus, in essence, Turnkey Fund served as a middleman between the oil and gas operators and Turnkey Fund's own investors: Turnkey Fund made investments in oil and gas offerings and essentially repackaged and resold those interests in those investments to Turnkey Fund Unit investors.

61.     Turnkey Fund Unit investors had no involvement in Turnkey Fund investment decisions or daily operations. Turnkey Fund offering materials stated that Turnkey Fund management "has full and complete authority, power, and discretion to make any and all decisions and do any and all things that [Turnkey Fund management] deems to be reasonably required to accomplish the business and objectives of [Turnkey Fund]."

62.     Cahoon was responsible for identifying the operators and projects in which Turnkey Fund invested and handling Turnkey Fund's daily affairs.

63.     Fossum reviewed and approved the investments Cahoon selected, and caused Turnkey Fund to enter into investment contracts.

64.     Fossum and Cahoon offered and sold Turnkey Fund Units directly to investors.

COMPLAINT

U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO 80294     Phone: 303-844-1000

65.     Fossum and Cahoon led Turnkey Fund Unit investors to expect profits solely from the efforts of Turnkey Fund. Turnkey Fund's offering materials state that no Turnkey Fund Unit investor shall "have the power to act on behalf of, sign for or bind [Turnkey Fund]."

66.     Fossum and Cahoon regularly communicated with prospective and actual Turnkey Fund Unit investors by phone and email, among other means, and transferred Turnkey Fund monies using interstate banking systems. Turnkey Fund Unit investors resided in a variety states, including, but not limited to, California, Colorado, Florida, Tennessee, Maryland, Utah, and Washington.

## B.   FOSSUM, CAHOON, AND THE MANAGING ENTITIES WERE INVESTMENT ADVISERS.

67.     Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b–2(a)(11)] defines an investment adviser as "any person who, for compensation, engages in the business of advising others . . . as to the value of securities or the advisability of investing in, purchasing, or selling securities . . . ."

68.     As detailed below, Fossum, Cahoon, and each of the Managing Entities acted as investment advisers to one or more of the SMFG Funds:

### i.   Fossum, SMFG, and Smart Money Manager Were Investment Advisers to Accelerated Asset.

69.     Fossum, SMFG, and Smart Money Manager conceived of, controlled, managed, and made investment decisions for Accelerated Asset.

70.     Fossum, SMFG, and Smart Money Manager engaged in the business of providing specific investment advice to Accelerated Asset, including by directing it to invest in securities and non-securities. Specifically, Fossum, SMFG, and Smart Money Manager advised Accelerated Asset to purchase 10,000 shares

COMPLAINT

U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO 80294     Phone: 303-844-1000

1 of stock in a debt collection company, and also to invest in non-security consumer

2 debt.

3    71.    Between 2012 and 2016, Fossum, SMFG, and Smart Money Manager

4 were compensated, directly or indirectly, for their investment advice. Fossum

5 caused Accelerated Asset to directly pay him cash compensation for such services.

6 Fossum also caused Accelerated Asset to transfer money to SMFG, which used the

7 money for a variety of purposes, including paying Smart Money Manager's

8 expenses.

9    **ii.    Fossum, SMFG, and Smart Money Manager Were Investment**

10 **Advisers to Smart Money Fund.**

11    72.    Fossum, SMFG, and Smart Money Manager conceived of, controlled,

12 managed, and made investment decisions for Smart Money Fund.

13    73.    Fossum, SMFG, and Smart Money Manager engaged in the business

14 of providing specific investment advice to Smart Money Fund, including by

15 directing it to invest in securities and non-securities. More specifically, they

16 advised Smart Money Fund to purchase the securities of a debt collection company

17 and a residential care facility, and also to invest in non-securities, such as real

18 estate and websites.

19    74.    Between 2012 and 2016, Fossum, SMFG, and Smart Money Manager

20 were compensated, directly or indirectly, for their advice. Fossum caused Smart

21 Money Fund to directly pay him cash compensation. Fossum also caused Smart

22 Money Manager to transfer money to SMFG, which used the money for a variety

23 of purposes, including paying Smart Money Manager's expenses.

24

25

26

27

28 COMPLAINT

U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO 80294    Phone: 303-844-1000

### iii. Fossum, Cahoon, SMFG, and Turnkey Manager Were Investment Advisers to Turnkey Fund.

75.     Fossum, SMFG, and Turnkey Manager conceived of, controlled, and had final approval over all investment decisions for Turnkey Fund.

76.     Cahoon and Turnkey Manager identified, assessed, and recommended investments for Turnkey Fund to Fossum, SMFG, and Turnkey Manager.

77.     Fossum, SMFG, and Turnkey Manager then reviewed and approved of the projects and instructed Cahoon and Turnkey Manager to cause Turnkey Fund to invest in the securities.

78.     Fossum, Cahoon, SMFG, and Turnkey Manager each engaged in the business of providing investment advice to Turnkey Fund by directing it to invest in securities: three oil and gas ventures in which Turnkey Fund used its investors' money to invest.

79.     Between mid-2013 and early 2015, Fossum, Cahoon, SMFG, and Turnkey Manager were compensated, directly or indirectly, for their advice to Turnkey Fund. Turnkey Fund paid the compensation in a variety of ways, including, but not limited to, by causing: (a) Turnkey Fund to pay Cahoon transaction-based cash compensation; (b) Turnkey Fund to pay some of Fossum's transaction-based compensation to Smart Money Fund (upon Fossum's request), which in turn funded SMFG and/or Smart Money Manager expenses; and (c) Turnkey Fund to pay Turnkey Manager expenses.

### iv. Fossum, Cahoon, and the Managing Entities Defrauded the SMFG Funds They Advised.

80.     As investment advisers, Fossum, Cahoon, and the Managing Entities owed fiduciary duties to the respective SMFG Funds they advised. These duties include the duties to act for the benefit of the funds, to exercise the utmost good

COMPLAINT

U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO 80294     Phone: 303-844-1000

faith in dealing with the funds, and to disclose all material facts related to any actual or potential investments by the funds. Further, as fiduciaries, Fossum, Cahoon, and the Managing Entities were required to avoid improper self-dealing.

81.     As described in greater detail below, Fossum, Cahoon, and the Managing Entities breached these duties and engaged in extensive fraud and deceptive conduct.

82.     As detailed below, Fossum and the Managing Entities knowingly, recklessly, or negligently acted in ways inconsistent with SMFG Fund offering documents, including by:

      a.   misappropriating SMFG Fund assets for personal use;

      b.   continuing to raise funds from new investors while concealing the inability to redeem Smart Money Fund Investment Contracts in accordance with Smart Money Fund offering documents;

      c.   disregarding the fact that each fund was a separate client and commingling assets between the SMFG Funds; and

      d.   misappropriating fund assets by paying themselves so-called "consulting fees" and/or "commissions" to which they were not entitled.

83.     Also as detailed below, Cahoon knowingly, recklessly, or negligently acted in ways inconsistent with Turnkey Fund offering documents, including by misappropriating fund assets by taking so-called "consulting fees" and "commissions to which he was not entitled.

C.    **THE FRAUDULENT CONDUCT**

   i.    **Fossum's Fraudulent Scheme and False and Misleading Statements and Omissions**

84.    Fossum engaged in a wide-ranging scheme to defraud the SMFG Funds and their investors. In furtherance of the scheme, Fossum knowingly, recklessly, or negligently engaged in numerous practices or courses of business that defrauded the SMFG Funds and their investors, including, but not limited to: (a) making false representations to investors in the SMFG Funds; (b) omitting additional material facts that were necessary to make several of his statements, in light of the circumstances under which they were made, not misleading; and (c) causing the SMFG Funds to operate in ways that were inconsistent with fund offerings documents, including by using the funds for his personal benefit and failing to redeem investments in accordance with agreed upon terms.

*Fossum Misappropriated SMFG Fund Assets and Thus Defrauded the SMFG Funds and Their Investors.*

85.    Fossum caused the SMFG Funds to provide him with an array of undisclosed personal benefits, including the payment of his own personal expenses. Such personal benefits included, but are not limited to, approximately:

   a.    $150,000 used to pay Fossum's personal income taxes;

   b.    $40,000 for Fossum's travel to Fiji, Mexico, Hawaii, and Africa for business seminars, along with money paid for Fossum's wife to accompany him on business trips; and

   c.    $300,000 in Fossum's personal expenses charged to SMFG Funds, including life insurance policies for Fossum and his wife ($64,000), certain membership fees ($83,000), luggage ($600), automobiles and vehicle repairs ($45,000), exercise machines

COMPLAINT

U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO 80294    Phone: 303-844-1000

and parts ($33,000), chiropractic treatments ($3,000), charitable donations ($4,000), cost of moving Fossum's parents ($1,300), Fossum "renting" his home (owned by Smart Money Fund) to SMFG ($15,000), paying off personal credit cards while redemption payments were overdue ($38,000), and cash Fossum spent on a trip to Whistler, Canada ($10,000).

86.     Fossum regularly told actual and prospective investors that he had "gifted" his own home to Smart Money Fund, which purportedly demonstrated that his interests were aligned with those of Smart Money Fund investors.

87.     This representation was intentionally misleading because Fossum knew that, in reality: (a) Smart Money Fund assumed the mortgage liability on the home, which was roughly equivalent to the home's market value, so that in reality Smart Money Fund was "gifted" no meaningful equity in the home and was required to repay the mortgage to keep the home; and (b) from September 2012 to June 2016, he continued to live in the home while Smart Money Fund paid the mortgage, utilities, and repairs—and Fossum paid nothing. The mortgage payments alone during this time period totaled roughly $140,000.

88.     Payments of these and other personal expenses were inconsistent with each of the SMFG Funds' offering documents regarding uses of proceeds, compensation, and reimbursement of expenses.

89.     For example, Accelerated Asset's offering materials disclosed that "if the Manager so decides," its manager would receive a "fixed fee and reimbursement of expenses." Likewise, Smart Money Fund's offering materials disclosed that Smart Money Manager could be paid "a fee and reimbursement of expenses." Turnkey Fund's offering materials disclosed only an initial 2.062

COMPLAINT

U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO 80294     Phone: 303-844-1000

percent per-unit fee, plus "a management fee that ranges between two percent (2%) and five percent (5%) of total revenue . . . ."

90.    These payments were also inconsistent with Fossum's knowing, reckless, or negligent oral misrepresentations to investors that he took no or minimal compensation for his work on behalf of the SMFG Funds.

91.    Fossum's misrepresentations and omissions regarding his personal benefits were material to the SMFG Funds and their respective investors. A reasonable investor would not have invested in any of the SMFG Funds had Fossum disclosed his ongoing use of fund assets for this array of personal benefits.

### *Fossum Misrepresented Smart Money Fund's Financial Condition to Investors.*

92.    Fossum knowingly, recklessly, or negligently touted Smart Money Fund to investors as a highly successful venture that was capable of repaying both the principal and substantial twelve percent annual interest accruals promised in the fund's offering documents. Fossum knew enough about the financial condition of Smart Money Fund at the time he made these representations that he knew, was reckless in not knowing, or was negligent in not knowing that the representations were false.

93.    Indeed, Fossum knowingly, recklessly, or negligently claimed Smart Money Fund was making money "hand over fist" even though, as of January 2014, Smart Money Fund's outside auditors, relying on Smart Money Fund's internal valuation of its assets and liabilities, notified Fossum's bookkeeper, who reported directly to Fossum, that Smart Money Fund's liabilities exceeded its assets by roughly $5 million. This statement was false.

94.    Fossum had no reasonable basis to believe that Smart Money Fund was profitable or capable of paying the twelve percent annual interest accruals

COMPLAINT

U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO 80294     Phone: 303-844-1000

when they came due at maturity. In fact, a Court-appointed Bankruptcy Examiner (the "**Bankruptcy Examiner**") determined that Smart Money Fund's portfolio of rental properties "was not profitable, losing between $1,000 and $2,000 per month in 2014 and 2015." During the same time period, Smart Money Fund's website investments generated roughly $2,000 to $3,000 per month in profits. Also during this time period, Smart Money Fund's other investments—in other real estate ventures, securities, and oil and gas ventures—failed to generate meaningful recurring profits.

95.     At least one significant Smart Money Fund investor relied on Fossum's mischaracterizations of the fund's financial status, including the misrepresentation that Smart Money Fund was making money "hand over fist," to invest in Smart Money Fund Investment Contracts in early 2014, to become SMFG's limited partner in Smart Money Manager, and to market investments in Smart Money Fund to his friends and family (the "**Smart Money Limited Partner**").

96.     Between early 2014 and approximately February 2015, Fossum, in furtherance of the scheme, knowingly, recklessly, or negligently represented to the Smart Money Limited Partner that Smart Money Fund had, "conservatively," $35 million to $40 million in diverse assets under management, and only owed $10 million to investors. This statement was false.

97.     The Smart Money Limited Partner repeated these misrepresentations to prospective Smart Money Fund Investment Contracts investors.

98.     When the Smart Money Limited Partner later began, in late 2014, to have doubts about certain Smart Money Fund investments, he pressed Fossum to provide him with data supporting his claims about Smart Money Fund's assets and liabilities. Fossum refused.

COMPLAINT

U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO 80294     Phone: 303-844-1000

99.    Fossum knew, was reckless in not knowing, or was negligent in not knowing about Smart Money Fund's financial condition. In fact, Fossum sat down with the Smart Money Limited Partner in February 2015 and listed all of Smart Money Fund's assets and his understanding of the value of each. Based upon Fossum's own optimistic estimates, Smart Money Fund had only between $10 million and $14 million in assets, most of which were highly illiquid.

100.    Fossum's misrepresentations and omissions regarding Smart Money Fund's financial condition were material to investors. The Smart Money Limited Partner would not have invested in Smart Money Fund, or marketed it to others, had he known Fossum's original estimates of $35 million to $40 million of assets under management to be so grossly inflated.

101.    Likewise, a reasonable investor would not have invested in Smart Money Fund had they known that Fossum was grossly overstating Smart Money Fund's profitability and assets under management.

### Fossum Misled Investors About Smart Money Fund's Solvency and Defrauded Smart Money Fund and its Investors by Raising Money While Failing to Disclose Smart Money Fund's Inability to Fulfill Redemptions.

102.    From approximately June 2015 until June 8, 2016, Smart Money Fund failed to meet forty-two investor redemptions that were due under the terms of Smart Money Fund Investment Contracts. Those due and owing redemptions totaled roughly $4,500,000.

103.    Notwithstanding Fossum's knowledge of Smart Money Fund's inability to fulfill redemptions, from June 2015 onward, Fossum continued to solicit and accept new investments in Smart Money Fund Notes and Smart Money Fund Investment Contracts.

COMPLAINT

U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO 80294    Phone: 303-844-1000

104.    The Smart Money Fund Investment Contracts that Fossum, SMFG, and Smart Money Manager offered investors during this time affirmatively misrepresented Smart Money Fund's financial condition, stating that Smart Money Fund was "in satisfactory financial condition, solvent, able to pay its bills when due and financially able to perform its contractual duties hereunder." Fossum knew, was reckless in not knowing, or was negligent in not knowing that this representation was false.

105.    Because Fossum controlled Smart Money Fund, he was the person with ultimate control over the content of the Smart Money Fund Investment Contracts, including whether and how that content and other statements regarding Smart Money Fund investments were communicated to investors.

106.    Similarly, after June 2015, the Smart Money Fund Notes stated that Smart Money Fund would use ninety percent of investor proceeds "for investment," with the remaining ten percent going to organizational and offering expenses, and the Smart Money Fund Investment Contracts stated that Smart Money Fund would use investor money "for the purchase" of a website. Fossum knew, was reckless in not knowing, or was negligent in not knowing those representations to be false and misleading at the time they were made.

107.    Fossum knew, was reckless in not knowing, or negligent in not knowing at the time he made the above statements that Smart Money Fund did not have the necessary liquidity to satisfy outstanding redemption requests.

108.    Fossum also knew, was reckless in not knowing, or was negligent in not knowing that new investor monies would be used to satisfy these outstanding redemptions, but omitted to state that material fact to investors.

109.    Fossum knowingly, recklessly, or negligently made these misrepresentations and material omissions, and accepted new Smart Money Fund

COMPLAINT

U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO 80294    Phone: 303-844-1000

Note and Smart Money Fund Investment Contract investments—totaling roughly $600,000—while knowingly, recklessly, or negligently failing to disclose the redemption backlog and Smart Money Fund's insolvency.

110.   Fossum also knowingly, recklessly, or negligently failed to disclose in fund offering documents or otherwise that new Smart Money Fund investor investments would be used, at least in part, to pay redemptions to prior Smart Money Fund investors in a Ponzi-like fashion.

111.   Fossum's misstatements and omissions regarding Smart Money Fund's financial condition and solvency were material to investors. A reasonable investor would not have made a Smart Money Fund Note or Smart Money Fund Investment Contract investment had they known at the time of investment that Smart Money Fund was insolvent, unable to pay millions of dollars of redemptions, and using new investor money to pay off more longstanding investors.

### *Fossum Defrauded the SMFG Funds by Improperly Commingling Their Money.*

112.   In breach of his fiduciary duties to the SMFG Funds, Fossum regularly transferred fund assets between the SMFG Funds to meet their separate liquidity needs.

113.   None of the offering materials for any of the SMFG Funds disclosed that assets of one fund would be commingled with or used to satisfy liabilities of another fund.

114.   Instead, the offering materials disclosed that the funds would use investor monies to make investments and pay reasonable management fees and costs. For example, Smart Money Fund's offering materials estimated that ninety percent of investor monies would be invested, and Accelerated Asset's offering

U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO 80294     Phone: 303-844-1000

materials indicated that investor monies would be used "primarily for the purchase of asset pools and limited general company purposes." This statement was false. Moreover, the offering materials contained material omissions in that they failed to disclose the true use of the funds, including that funds were commingled between the SMFG Funds.

115.   Fossum repeatedly assured investors that he "always wanted to take care of investors first" and had their best interests in mind. For example, Fossum told the Smart Money Limited Partner this in or about late 2014, and repeated it again in a "webinar" presentation to SMFG Fund investors as late as March 9, 2016.

116.   Fossum controlled the bank accounts of each of the SMFG Funds through the Managing Entities. Fossum caused the transfer of funds that had the effect of commingling assets between SMFG, Accelerated Asset, Smart Money Fund, and Turnkey Fund.

117.   It was Fossum's regular practice from the formation of each of the SMFG Funds until the funds' bankruptcy to use assets in one fund to purchase assets or cover expenses for another fund, and Fossum failed to track these inter-fund transfers in any meaningful regard—let alone disclose such mismanagement to the SMFG Funds or fund investors.

118.   The commingling of assets between the SMFG Funds was so pervasive, and the absence of internal accounting of those transfers was so profound, that a team of forensic accountants working on behalf of the Bankruptcy Examiner concluded that it would be prohibitively costly and time consuming to try to unwind the commingling.

119.   The Bankruptcy Examiner identified numerous instances of improper transactions between the SMFG Funds, including but not limited to, a total of:

COMPLAINT

U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO 80294     Phone: 303-844-1000

a.    $220,577.84 transferred from Accelerated Asset to Smart Money Fund, Turnkey Fund, and/or SMFG;

b.    $1,777,547.40 transferred from Smart Money Fund to Accelerated Asset, Turnkey Fund, and/or SMFG; and

c.    $1,340,342.89 transferred from Turnkey Fund to Accelerated Asset, Smart Money Fund, and/or SMFG.

120.   Fossum's commingling of money and improper transfers between the SMFG Funds were material to the SMFG Funds and their respective investors. A reasonable investor would not have invested in any of the SMFG Funds had Fossum disclosed this extensive and ongoing commingling.

### *Fossum and the Managing Entities Engaged in a Scheme and Fraudulent Practices or Courses of Business to Defraud the SMFG Funds and Their Investors.*

121.   As outlined above in paragraphs 84 through 120, since approximately 2011 and continuing through approximately June 2016, Fossum engaged in a scheme to defraud the SMFG Funds and the investors in those funds. In furtherance of the scheme, as described herein, Fossum knowingly, recklessly, or negligently engaged in numerous practices or courses of business that defrauded the SMFG Funds and their investors, including, but not limited to:

a.    Making material misstatements and omissions in offering documents, as well as communications with investors and others;

b.    Misappropriating money from the SMFG Funds and thereby diminishing their value;

c.    Commingling funds and assets between the SMFG Funds;

COMPLAINT

U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO 80294    Phone: 303-844-1000

d.    Raising money from investors while misstating that Smart Money Fund was solvent and/or failing to disclose its insolvency;

e.    Using new investments to redeem prior investments in a Ponzi-like fashion; and

f.    Failing to redeem investments as promised in offering documents.

122.   Fossum controlled the SMFG Funds through his control of the Managing Entities. Because an actor's securities law violations are imputed to their corporate embodiments, SMFG, Smart Money Manager, and/or Turnkey Manager engaged in the very same misconduct as that which is attributed to Fossum herein.

123.   Both Fossum and the Managing Entities obtained money or property as a result of the misconduct detailed above, including cash compensation and personal benefits to Fossum, as well as the payment of the Managing Entities' expenses.

**ii.    Fossum and Cahoon Misrepresented Compensation They Took from Turnkey Fund.**

124.   Prior to soliciting investments in Turnkey Fund Units, Fossum and Cahoon secretly agreed that they would split the difference between (a) Turnkey Fund's cost to purchase a unit from the project operator, and (b) the amount investors paid for their Turnkey Fund Units.

125.   Fossum and Cahoon referred interchangeably to their profits from this endeavor as their "commissions" and "markup."

126.   For the first of the three Turnkey Fund projects, the "commission" Fossum and Cahoon agreed to split was $20,000 per unit, which amounted to 13.7 percent of the $145,000 per-unit price Turnkey Fund charged its investors.

COMPLAINT

U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO 80294    Phone: 303-844-1000

127.   In written Turnkey Fund offering materials, emails to investors, and in oral representations, Fossum and Cahoon failed to disclose the existence of this agreement to take secret "commissions" or "markups" and falsely disclosed to investors that they would only be charged an initial fee of 2.062 percent, or $2,990, for each Turnkey Fund Unit sold.

128.   Fossum, who was ultimately responsible for the contents of the offering materials, acknowledged in writing that he proofread them and that errors in the documents were "100% MY FAULT."

129.   Cahoon acknowledged reviewing the offering materials pertaining to the Turnkey Fund's oil and gas activities.

130.   For example, Turnkey Fund offering materials for the first two projects contained the following chart, which not only does not disclose any "commissions," but also misstates how investor money for each Turnkey Fund Unit would be employed:

### SOURCES AND USES OF PROCEEDS
#### Estimated Application of Proceeds of This Offering

The proceeds of this Offering will be used as described generally below and will vary depending upon the Project acquired as a Venture Asset.  The Offering will have no sources of funds other than the Venturers' investments and potential revenues from the production of Program Well(s).

| Description | Per Interest | Percentage | Maximum Amount |
|---|---|---|---|
| **SOURCES** | | | |
| Contributions of Investors | $ 145,000 | 100% | $ 100,000,000 |
| **USES** | | | |
| G&G, Engineering, Legal and Leasehold | $ 17,938 | 12.371% | $ 12,371,000.00 |
| Organizational Reimbursement Fee | $ 2,990 | 2.062% | $ 2,062,000.00 |
| Drilling Costs | $ 71,753 | 49.485% | $ 49,485,000.00 |
| Completion Costs | $ 49,329 | 34.020% | $ 34,020,000.00 |
| Management Fee | $ 2,990 | 2.062% | $ 2,062,000.00 |
| Total Uses | $ 145,000 | 100.000% | $ 100,000,000.00 |

131.   This chart disclosed a misleading "Management Fee" of only $2,990 per unit sold, and also misstated how a $145,000 investment would be allocated, in

COMPLAINT

U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO 80294     Phone: 303-844-1000

both dollar and percentage amounts. It thus omitted material facts making the representation about Turnkey Fund management's compensation misleading.

132.   Despite this disclosure, Fossum and Cahoon took $20,000 or more from each Turnkey Fund Unit sold, rendering both the dollar amounts and the percentages set forth in the table materially misleading.

133.   Fossum also misrepresented and made material omissions about Turnkey Fund fees in other ways. For example, in a November 5, 2013 email to an investor in response to the investor identifying a clear error in the Turnkey Fund offering documents, Fossum took responsibility for the error and then proceeded to affirmatively represent that Turnkey Fund management would only collect a "2.5%" fee—with no mention of his actual agreement with Cahoon to collect $20,000 or more for each unit sold.

134.   Between late 2013 and early 2014, Fossum caused Turnkey Fund to pay Cahoon between $10,000 and $14,000 per month in what were characterized in Turnkey Fund records as "consulting fees."

135.   Turnkey Fund offering materials did not disclose the consulting fees paid to Cahoon.   Pursuant to the Turnkey Fund offering documents, Turnkey Fund management was only entitled to an ongoing fee of two to five percent of Turnkey Fund's oil and gas revenues.   However, during the period when Cahoon took these "consulting fees," Turnkey Fund received little to no revenue payments.

136.   Thereafter, between mid-2014 and early 2015, Cahoon, acting with Fossum's approval, caused Turnkey Manager to cause Turnkey Fund to pay Cahoon transaction-based compensation based on the number of Turnkey Fund units sold. These amounts constituted Cahoon's portion of the "markup" on units sold to Turnkey Fund investors, totaling roughly $260,000.

COMPLAINT

U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO 80294     Phone: 303-844-1000

137.   Similarly, Cahoon caused Turnkey Fund to pay Fossum, directly or indirectly, transaction-based compensation based upon Turnkey Fund units sold, totaling roughly $150,000.

138.   Turnkey Manager's operating documents vested SMFG with authority to make all decisions on behalf of Turnkey Manager, and Fossum controlled SMFG.

139.   Fossum delegated authority to Cahoon to take certain actions on behalf of Turnkey Manager, including identifying and recommending investments for Turnkey Fund, but Fossum maintained ultimate control over Turnkey Fund and Turnkey Manager.

140.   Fossum made the material misstatements and misleading omissions in the Turnkey Fund offering materials. Fossum drafted, with input from Cahoon, the Turnkey Fund offering materials, and Fossum had ultimate authority over the contents of those offering materials and how they were communicated to prospective investors, including, but not limited to, the highly misleading "Sources and Uses of Proceeds" table set forth above.

141.   At the time Fossum made the material misstatements and misleading omissions, Fossum knew that he and Cahoon were taking money from Turnkey Fund in the form of "consulting fees" and/or "commissions," and Fossum knew, was reckless in not knowing, or negligent in not knowing that these payments were not reflected in Turnkey Fund offering materials or disclosed to investors in any other way.

142.   Similarly, Cahoon also knew, was reckless in not knowing, or negligent in not knowing that payments he took from Turnkey Fund were not reflected in Turnkey Fund offering materials or disclosed to investors in any other way.

COMPLAINT

U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO 80294     Phone: 303-844-1000

143.   In fact, Fossum and Cahoon discussed the hidden nature of the compensation arrangement, and both chose to offer and sell Turnkey Fund Units to investors notwithstanding this knowledge.

144.   The misstatements and omissions by Fossum and Cahoon as to their compensation from Turnkey Fund were material to investors. A reasonable investor would not have purchased Turnkey Fund Units had they known about the secret agreement to take $20,000 or more in "commissions" for each Turnkey Fund Unit sold.

145.   Likewise, a reasonable investor would not have invested in Turnkey Fund had they known that Cahoon would draw lavish "consulting fees" from Turnkey Fund at a time when it was generating little to no revenue.

146.   Accordingly, Fossum and Cahoon obtained money or property from Turnkey Fund investors by means of untrue statements of material fact or omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, regarding their compensation arrangements and the use of investor proceeds.

147.   Fossum controlled Turnkey Fund through his control of SMFG and Turnkey Manager, and Cahoon controlled Turnkey Fund through his partial control of Turnkey Manager. Because an actor's securities law violations are imputed to their corporate embodiments, SMFG and Turnkey Manager engaged in the very same misconduct as that which is attributed to Fossum and Cahoon throughout paragraphs 84 through 146, above.

**D.    THE BANKRUPTCY OF THE MANAGING ENTITIES AND THE SMFG FUNDS**

148.   On June 8, 2016, Fossum caused the Managing Entities, the SMFG Funds, and certain other entities he owned or controlled (collectively, "**Debtors**")

COMPLAINT

U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO 80294     Phone: 303-844-1000

1   to file for bankruptcy in the U.S. Bankruptcy Court for the Middle District of

2   Florida (Case No: 6:16-bk-03817-RAC).

3       149.   On November 21, 2016, the Court-appointed Bankruptcy Examiner

4   filed a report explaining that because Debtors' assets had been so thoroughly and

5   inextricably intermingled, any effort to differentiate between the assets and

6   liabilities of each entity would be less cost-efficient than treating all of the Debtors

7   as a single, consolidated entity for purposes of the bankruptcy.

8       150.   On December 27, 2017, the Bankruptcy Court agreed and ordered that

9   "Debtor entities are hereby substantively consolidated into a single estate

10  comprised of all assets of the estates and subject to all liabilities of each of the

11  estates."

12      151.   On February 1, 2017, the Bankruptcy Court approved a plan of

13  liquidation under Chapter 11 of the Bankruptcy Code. Promptly thereafter,

14  Debtors' assets were transferred to a liquidating trust and Debtors were deemed to

15  be dissolved.

16  **E.   FOSSUM AND CAHOON ENGAGED IN THE UNREGISTERED OFFER**

17        **AND SALE OF SECURITIES.**

18      152.   From approximately May 2012 through at least April 2016, Fossum

19  and Smart Money Fund offered and sold Smart Money Fund Notes. During that

20  time, no registration statement was filed or in effect for the transactions. In the

21  Smart Money Fund Notes offering, Smart Money Fund raised more than $7 million

22  from roughly one hundred investors in numerous states.

23      153.   From approximately March 2013 through at least April 2015, Fossum

24  and Smart Money Fund offered and sold Smart Money Fund Investment Contracts.

25  During that time, no registration statement was filed or in effect for the

26  transactions. In the Smart Money Fund Investment Contracts offering, Smart

27

28

COMPLAINT

U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO 80294   Phone: 303-844-1000

Money Fund raised approximately $6 million from roughly sixty investors in numerous states.

154.   From approximately July 2013 and November 2014, Fossum, Cahoon and Turnkey Fund offered and sold Turnkey Fund Units. During that time, no registration statement was filed or in effect for the transactions. In the Turnkey Fund Units offering, Turnkey Fund raised approximately $6 million from approximately thirty investors in numerous states.

155.   Fossum offered and sold Smart Money Fund Notes, Smart Money Fund Investment Contracts, and Turnkey Fund Units through the use of the internet, email, telephone calls, and live meetings with investors, including investors outside of Washington and Nevada. Fossum personally solicited purchases from investors.

156.   Cahoon offered and sold Turnkey Fund Units through the use of the internet, email, telephone calls, and live meetings with investors, including investors outside of Washington and Nevada. Cahoon personally solicited purchases from investors.

157.   Smart Money Fund and Turnkey Fund filed Forms D with the Commission in which each fund claimed exemption from registration under the Securities Act pursuant to Rule 506(b) of Regulation D [17 C.F.R. § 230.506(b)], which allows the unregistered sale of securities provided that, among other things, all non-accredited investors are given at least an audited balance sheet prior to investing in the securities.

158.   The Smart Money Fund Notes, Smart Money Fund Investment Contracts, and Turnkey Fund Units are not, however, exempt from registration under that rule because:

COMPLAINT

U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO 80294    Phone: 303-844-1000

a.   At least some of the Smart Money Fund Note, Smart Money Fund Investment Contract, and Turnkey Fund Unit investors were unsophisticated individuals who lacked the income and net worth required to meet the definition of "accredited investor" under Rule 501(a) of Regulation D [17 C.F.R. § 230.501(a)]; and

b.   Contrary to the requirements of Rule 506(b), neither Smart Money Fund nor Turnkey Fund ever furnished to any non-accredited Smart Money Fund or Turnkey Fund investor the information specified in Rule 502(b)(2) of Regulation D [17 C.F.R. § 230.502(b)(2)], including at least an audited balance sheet.

159.   No other exemption to registration applies to the Smart Money Fund Notes, Smart Money Fund Investment Contracts, and Turnkey Fund Units offerings.

**F.   FOSSUM AND CAHOON ACTED AS TURNKEY FUND BROKERS BUT FAILED TO REGISTER AS SUCH WITH THE COMMISSION.**

160.   Section 3(a)(4) of the Exchange Act defines a "broker" as any person who is engaged in the business of effecting transactions in securities for the account of others.  Section 15(a)(1) of the Exchange Act prohibits a broker or dealer from using jurisdictional means such as the telephone or mails to effect transactions in securities unless the broker or dealer is registered with the Commission.

161.   Fossum and Cahoon used the telephone and the mails to effect purchases and sales of securities in Turnkey Fund Units.  Neither Fossum nor Cahoon was registered with the Commission as a broker or associated with a

COMPLAINT

U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO 80294     Phone: 303-844-1000

broker-dealer registered with the Commission during the time in which they sold Turnkey Fund Units to investors.

162.   Fossum actively solicited Turnkey Fund Unit investments from current and prospective customers, and participated at key points in the investment chain, including advising investors on the merits of the investment.

163.   Fossum earned transaction-based compensation in the form of a per-unit fee from Turnkey Fund, and he marketed Turnkey Fund investments to existing and prospective clients.  For example, Fossum recommended to some Smart Money Fund investors that they liquidate some of their Smart Money Fund investments to invest in Turnkey Fund.

164.   Likewise, Cahoon actively solicited investments in Turnkey Fund Units, and participated at key points in the investment chain, including advising investors on the merits of investing in Turnkey Fund.

165.   Cahoon sat with investors and showed them their potential earnings from a Turnkey Fund investment, and advised them with respect to the risks associated with such investments.

166.   Cahoon took an active role in finding investors, as he recruited the first five investors who brought roughly one million dollars in investments intended for Turnkey Fund.

167.   Cahoon took transaction-based compensation from Turnkey Fund from approximately mid-2014 through early 2015, in the form of a per-unit fee.

168.   Cahoon also served as the principal contact between Turnkey Fund and its investors, sending monthly email updates on the status of the Turnkey Fund projects.

COMPLAINT

U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO 80294    Phone: 303-844-1000

**G.   ALTERNATIVELY, FOSSUM AND CAHOON AIDED AND ABETTED PRIMARY VIOLATIONS BY THE MANAGING ENTITIES AND/OR EACH OTHER.**

   **i.   Fossum and Cahoon Aided and Abetted Advisers Act Violations.**

   169.   SMFG and Smart Money Manager were investment advisers to Smart Money Fund and Accelerated Asset.

   170.   SMFG and Turnkey Manager were investment advisers to Turnkey Fund.

   171.   Fossum aided and abetted SMFG's, Smart Money Manager's, and Turnkey Manager's respective violations of Sections 206(1) and 206(2) of the Advisers Act as to their advisory clients, Accelerated Asset, Smart Money Fund, and Turnkey Fund.

   172.   Sections 206(1) and 206(2) of the Advisers Act prohibit an investment adviser from employing "any device, scheme, or artifice to defraud" or engaging "in any transaction, practice, or course of business that operates as a fraud or deceit upon" any client or prospective client. These sections impose a fiduciary duty upon an investment adviser to exercise the utmost good faith in dealing with their clients, to disclose to their clients all material facts, and to employ reasonable care to avoid misleading their clients.

   173.   As detailed above, SMFG, Smart Money Manager, and Turnkey Manager, violated Sections 206(1) and 206(2) of the Advisers Act by, among other things, misappropriating SMFG Fund assets for Fossum's personal use; commingling assets between the SMFG Funds; continuing to raise funds from investors while failing to disclose Smart Money Fund's inability to redeem Smart Money Fund Investment Contracts in accordance with Smart Money Fund offering

COMPLAINT

U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO 80294    Phone: 303-844-1000

documents; and misappropriating fund assets by paying Fossum and/or Cahoon "consulting fees" and/or "commissions" to which they were not entitled.

174.   Also as detailed above, Fossum aided and abetted SMFG's, Smart Money Manager's, and Turnkey Manager's violations by knowingly and recklessly providing substantial assistance to those violations. Among other things, Fossum directed the misappropriation of SMFG Fund assets for his personal use and the commingling of assets between the SMFG Funds. Fossum solicited Smart Money Fund investors while failing to disclose Smart Money Fund's inability to redeem Smart Money Fund Investment Contracts in accordance with Smart Money Fund offering documents. Fossum also directed or approved the misappropriation of Turnkey Fund's assets by paying himself and/or Cahoon "commissions" and/or "consulting fees" to which they were not entitled.

175.   Cahoon aided and abetted Turnkey Manager's violations of Sections 206(1) and 206(2) of the Advisers Act as to its advisory client, Turnkey Fund.

176.   As detailed above, Turnkey Manager violated Sections 206(1) and 206(2) of the Advisers Act by, among other things, by misappropriating fund assets to pay Cahoon and Fossum "commissions" to which they were not entitled.

177.   Also as detailed above, Cahoon aided and abetted Turnkey Manager's violations by knowingly and recklessly providing substantial assistance to those violations. Among other things, Cahoon orchestrated the misappropriation of Turnkey Fund's assets by causing Turnkey Fund to pay him and Fossum "commissions" to which they were not entitled.

ii.     **Fossum and Cahoon Aided and Abetted Violations of the Anti-Fraud Provisions of the Securities Act and the Exchange Act.**

178.   Fossum aided and abetted SMFG's, Smart Money Manager's, Turnkey Manager's, and Cahoon's fraudulent conduct.

COMPLAINT

U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO 80294     Phone: 303-844-1000

179.   Sections 17(a)(1) and (3) of the Securities Act prohibit, in the offer or sale of securities, employing any device, scheme, or artifice to defraud and engaging in any practice which operates or would operate as a fraud on the purchaser. Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) promulgated thereunder prohibit the same conduct if committed in connection with the purchase or sale of securities.

180.   Section 17(a)(2) of the Securities Act makes it unlawful, in the offer or sale of securities, to obtain money or property by means of misstatements or omissions of material facts necessary to render statements not misleading. Section 10(b) and Rule 10b-5(b) prohibit the making of a materially false or misleading statement or omission in connection with the purchase or sale of securities with scienter.

181.   As detailed above, SMFG, Smart Money Manager, Turnkey Manager, and/or Cahoon violated Sections 17(a)(1), 17(a)(2), and/or 17(a)(3) of the Securities Act, and SMFG, Smart Money Manager, and/or Turnkey Manager violated Section 10(b) of the Exchange Act and Rules 10b-5(a) 10b-5(b), and/or 10b-5(c) thereunder by, among other things, misrepresenting Smart Money Fund's financial condition to investors; misappropriating SMFG Fund assets; transferring money indiscriminately between the SMFG Funds; misrepresenting Turnkey Fund management compensation; misleading investors about Smart Money Fund's solvency; and failing to fulfill Smart Money Fund Investment Contract redemptions consistent with the terms of Smart Money Fund offering documents.

182.   Also as detailed above, Fossum aided and abetted violations by SMFG, Smart Money Manager, Turnkey Manager, and/or Cahoon by knowingly and recklessly providing substantial assistance to those violations. Among other things, Fossum misrepresented Smart Money Fund's financial condition to

investors in connection with the Smart Money Fund offering; misappropriated SMFG Fund assets; transferred money indiscriminately between the SMFG Funds; misrepresented Turnkey Fund management compensation; misled investors about Smart Money Fund's solvency; and failed to disclose Smart Money Fund's inability to fulfill Smart Money Fund Investment Contract redemptions in a manner that was consistent with the terms of offering documents.

183.   Cahoon aided and abetted Turnkey Manager's and/or Fossum's fraudulent conduct.

184.   As detailed above, SMFG, Turnkey Manager, and/or Fossum violated Section 17(a)(2) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder by, among other things, misrepresenting Turnkey Fund management compensation.

185.   Also as detailed above, Cahoon aided and abetted violations by SMFG, Turnkey Manager, and/or Fossum by knowingly and recklessly providing substantial assistance to those violations. Among other things, Cahoon misrepresented to investors the compensation that he and Fossum took from Turnkey Fund.

## FIRST CLAIM FOR RELIEF

### Fraud (Misstatements and Omissions): Section 10(b) of the Exchange Act and Rule 10b-5(b)

### [15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5(b)]

### (Fossum)

186.   The Commission realleges and incorporates by reference paragraphs 1 through 185, as though fully set forth herein.

187.   Fossum, directly or indirectly, acting with scienter, by use of the means or instrumentalities of interstate commerce, or of the mails, or of a facility

COMPLAINT

U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO 80294    Phone: 303-844-1000

of a national securities exchange, in connection with the purchase or sale of Turnkey Fund and/or Smart Money Fund securities, made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

188.   By virtue of the foregoing, Fossum, directly or indirectly, violated and, unless restrained and enjoined, will again violate Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder.

## SECOND CLAIM FOR RELIEF

**Fraud (Misstatements and Omissions): Section 17(a)(2) of the Securities Act**

**[15 U.S.C. § 77q(a)(2)]**

**(Fossum and Cahoon)**

189.   The Commission realleges and incorporates by reference paragraphs 1 through 188, as though fully set forth herein.

190.   Fossum, directly or indirectly, in the offer or sale of Turnkey Fund and/or Smart Money Fund securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, acting with the requisite state of mind, obtained money or property by means of an untrue statement of material fact or omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

191.   Cahoon, directly or indirectly, in the offer or sale of Turnkey Fund securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, acting with the requisite state of mind, obtained money or property by means of an untrue statement of material fact

COMPLAINT

U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO 80294    Phone: 303-844-1000

1  or omission to state a material fact necessary in order to make the statements made,

2  in light of the circumstances under which they were made, not misleading.

3       192.  By virtue of the foregoing, Fossum and Cahoon, directly or indirectly,

4  violated and, unless restrained and enjoined, will again violate Section 17(a)(2) of

5  the Securities Act.

6  ### THIRD CLAIM FOR RELIEF

7  **Aiding and Abetting Violations of Section 10(b) of**

8  **the Exchange Act and Rule 10b-5(b)**

9  **(Cahoon)**

10       193.  The Commission realleges and incorporates by reference paragraphs

11  1 through 192, as though fully set forth herein.

12       194.  With respect to Turnkey Fund securities, Cahoon knowingly and

13  recklessly provided substantial assistance to violations of Section 10(b) of the

14  Exchange Act and Rule 10b-5 thereunder by Fossum, SMFG, and/or Turnkey

15  Manager.

16       195.  By virtue of the foregoing, Cahoon aided and abetted, and unless

17  restrained and enjoined, will continue aiding and abetting violations of Section

18  10(b) of the Exchange Act and Rule 10b-5(b) thereunder.

19  ### FOURTH CLAIM FOR RELIEF

20  **Aiding and Abetting Violations of Section 10(b) of the Exchange Act**

21  **and Rule 10b-5(b)**

22  **(Fossum, alternatively)**

23       196.  The Commission realleges and incorporates by reference paragraphs 1

24  through 195, as though fully set forth herein.

25       197.  With respect to Turnkey Fund and Smart Money Fund securities,

26  Fossum knowingly and recklessly provided substantial assistance to violations of

27

28  COMPLAINT

U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO 80294   Phone: 303-844-1000

Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder by SMFG, Smart Money Manager, and/or Turnkey Manager.

198.   By virtue of the foregoing, Fossum aided and abetted, and unless restrained and enjoined, will continue aiding and abetting violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder by SMFG, Smart Money Manager, and/or Turnkey Manager.

## FIFTH CLAIM FOR RELIEF

### Aiding and Abetting Violations of Section 17(a)(2) of
### the Securities Act
### (Fossum and Cahoon, alternatively)

199.   The Commission realleges and incorporates by reference paragraphs 1 through 198, as though fully set forth herein.

200.   With respect to Turnkey Fund securities, Cahoon knowingly and recklessly provided substantial assistance to violations of Section 17(a)(2) of the Securities Act by Fossum, SMFG, and/or Turnkey Manager.

201.   With respect to Turnkey Fund securities and Smart Money Fund securities, Fossum knowingly and recklessly provided substantial assistance to violations of Section 17(a)(2) of the Securities Act by Cahoon, SMFG, and/or Turnkey Manager.

202.   By virtue of the foregoing, Cahoon and/or Fossum aided and abetted, and unless restrained and enjoined, will continue aiding and abetting violations of Section 17(a)(2) of the Securities Act.

COMPLAINT                                    U.S. Securities and Exchange Commission
                                             1961 Stout Street, Suite 1700
                                             Denver, CO 80294    Phone: 303-844-1000

1

## SIXTH CLAIM FOR RELIEF

2
## Fraud (Scheme): Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c)

3
### [15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5(a), (c)]

4
### (Fossum)

5
203.   The Commission realleges and incorporates by reference paragraphs

6
1 through 202, as though fully set forth herein.

7
204.   Fossum, directly or indirectly, acting with scienter, by use of the

8
means or instrumentalities of interstate commerce, or of the mails, or of a facility

9
of a national securities exchange, in connection with the purchase or sale of a

10
security: employed devices, schemes, or artifices to defraud; or engaged in acts,

11
practices, or courses of business which operated or would operate as a fraud or

12
deceit upon another person.

13
205.   By virtue of the foregoing, Fossum, directly or indirectly, violated,

14
and, unless restrained and enjoined, will again violate Section 10(b) of the

15
Exchange Act and Rule 10b-5(a) and (c) thereunder.

16
## SEVENTH CLAIM FOR RELIEF

17
## Fraud (Scheme): Section 17(a)(1) and (3) of the Securities Act

18
### [15 U.S.C. § 77q(a)(1), (3)]

19
### (Fossum)

20
206.   The Commission realleges and incorporates by reference paragraphs 1

21
through 205, as though fully set forth herein.

22
207.   Fossum, directly or indirectly, in the offer or sale of securities, by use

23
of the means or instruments of transportation or communication in interstate

24
commerce or by use of the mails, acting with the requisite state of mind, employed

25
a device, scheme, or artifice to defraud and engaged in transactions, practices, or a

26

27

28

COMPLAINT

U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO 80294     Phone: 303-844-1000

course of business which operated or would operate as a fraud or deceit upon purchasers.

208.   By virtue of the foregoing, Fossum, directly or indirectly, violated and, unless restrained and enjoined, will again violate Sections 17(a)(1) and (3) of the Securities Act.

## EIGHTH CLAIM FOR RELIEF

### Fraud: Violations of 206(1) and 206(2) of the Advisers Act
### [15 U.S.C. § 80b-6(1), (2)]
### (Fossum and Cahoon)

209.   The Commission realleges and incorporates by reference paragraphs 1 through 208, as though fully set forth herein.

210.   Fossum and Cahoon, directly or indirectly, knowingly, recklessly, or negligently, by use of the mails or any means or instrumentality of interstate commerce, while acting as an investment adviser within the meaning of Section 202(11) of the Advisers Act [15 U.S.C. § 80b-2(11)], have: (a) employed devices, schemes, and artifices to defraud a client or prospective client; and/or (b) engaged in transactions, practices, or courses of business which operate as a fraud or deceit upon a client or prospective client.

211.   Fossum and Cahoon knew, were reckless in not knowing, or was negligent in not knowing of the activities described herein.

212.   By reason of the foregoing, Fossum and Cahoon violated, and unless restrained and enjoined, will continue violating, Sections 206(1) and 206(2) of the Advisers Act.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## NINTH CLAIM FOR RELIEF

### Aiding and Abetting Violations of

### Sections 206(1) and 206(2) of the Advisers Act

### (Fossum and Cahoon, alternatively)

213.   The Commission realleges and incorporates by reference paragraphs 1 through 212, as though fully set forth herein.

214.   Fossum knowingly and recklessly provided substantial assistance to violations of Sections 206(1) and 206(2) by SMFG, Smart Money Manager, Turnkey Manager, and/or Cahoon.

215.   Cahoon knowingly and recklessly provided substantial assistance to violations of Sections 206(1) and 206(2) by SMFG, Turnkey Manager, and/or Fossum.

216.   By reason of the foregoing, Fossum and/or Cahoon aided and abetted, and unless retrained and enjoined, will continue aiding and abetting violations of Sections 206(1) and 206(2) of the Advisers Act.

## TENTH CLAIM FOR RELIEF

### Fraud (Scheme): Control Person Liability Under Section 20(a) of the

### Exchange Act for Violations of Exchange Act Section 10(b) and Rules

### 10b-5(a), (b), and (c)

### [15 U.S.C. § 78t(a)]

### (Fossum, alternatively)

217.   The Commission realleges and incorporates by reference paragraphs 1 through 216, as though fully set forth herein.

218.   SMFG, Smart Money Manager, and Turnkey Manager, directly or indirectly, acting with scienter, by use of the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities

**46**

COMPLAINT

exchange, in connection with the purchase or sale of a security, made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

219.   Fossum exercised control over the management, general operations, and policies of SMFG, Smart Money Manager, and Turnkey Manager, as well as the specific activities upon which SMFG's, Smart Money Manager's, and Turnkey Manager's violations are based.

220.   By virtue of the foregoing, Fossum is liable as a control person under Section 20(a) of the Exchange Act for SMFG's, Smart Money Manager's, and Turnkey Manager's violations of Section 10(b) of the Exchange Act and Rule 10b-5(a), (b), and (c) thereunder.

## ELEVENTH CLAIM FOR RELIEF

### Unregistered Broker-Dealer: Violations of Exchange Act Section 15(a)

### [15 U.S.C. § 78o(a)]

### (Fossum and Cahoon)

221.   The Commission realleges and incorporates by reference paragraphs 1 through 220, as though fully set forth herein.

222.   Fossum and Cahoon made use of the mails or any means or instrumentalities of interstate commerce to effect transactions in securities, or to induce or attempt to induce the purchase or sale of securities, without being associated with a broker or dealer that was registered with the Commission in accordance with Section 15(b) of the Exchange Act.

223.   By reason of the foregoing, Fossum and Cahoon violated and, unless enjoined, are reasonably likely to continue to violate, Section 15(a)(1) of the Exchange Act.

COMPLAINT

U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO 80294    Phone: 303-844-1000

1

## TWELFTH CLAIM FOR RELIEF

2

### Unregistered Sale of Securities: Violations of

3

### Sections 5(a) and (c) of the Securities Act

4

### [15 U.S.C. § 77e(a) and (c)]

5

### (Fossum and Cahoon)

6        224.   The Commission realleges and incorporates by reference paragraphs 1

7 through 223, as though fully set forth herein.

8        225.   Fossum and Cahoon, directly or indirectly, by use of the means or

9 instrumentalities of interstate commerce, or of the mails, in connection with the

10 purchase or sale of a security, offered and sold securities or carried or caused such

11 securities to be carried through the mails or in interstate commerce, for the purpose

12 of sale or delivery after sale, when no registration statement had been filed or was

13 in effect as to such securities.

14        226.   By virtue of the foregoing, Fossum and Cahoon, directly or indirectly,

15 violated and, unless restrained and enjoined, will again violate Sections 5(a) and

16 (c) of the Securities Act.

17

## PRAYER FOR RELIEF

18        WHEREFORE, the Commission respectfully requests that the Court:

19

### I

20        Find that each of the Defendants committed the violations alleged in this

21 Complaint;

22

### II

23        Enter an injunction, in a form consistent with Rule 65(d) of the Federal

24 Rules of Civil Procedure, permanently restraining and enjoining each of the

25 Defendants from violating, directly or indirectly, the laws and rules alleged in this

26 Complaint to have been violated;

27

28

COMPLAINT                                           U.S. Securities and Exchange Commission
                                                    1961 Stout Street, Suite 1700
                                                    Denver, CO 80294     Phone: 303-844-1000

### III

Order that each of the Defendants disgorge any and all ill-gotten gains, together with pre- and post-judgment interest, derived from the improper conduct set forth in this Complaint;

### IV

Order that each of the Defendants pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], and Sections 209(e) and (f) of the Advisers Act [15 U.S.C. §§ 80b-9(e), (f)] in amounts to be determined by the Court, plus post-judgment interest; and

### V

Order such other relief as this Court may deem just or appropriate.

### **JURY DEMAND**

The Commission demands a trial by jury on all claims so triable.

Dated:  December 19, 2017

<div style="margin-left:40%">

By: s/ Terry R. Miller
By: s/ Leslie J. Hughes
Terry R. Miller (Co. Bar No. 39007)
Leslie J. Hughes (Co. Bar No. 15043)
Attorneys for Plaintiff
Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, Colorado 80294
Telephone: (303) 844-1000
Email:     millerte@sec.gov
                hugheslj@sec.gov

</div>

COMPLAINT

U.S. Securities and Exchange Commission
1961 Stout Street, Suite 1700
Denver, CO 80294     Phone: 303-844-1000